UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JOHN and BEVERLY TERZANI, as
administrators of the estate of John J. Terzani,
Jr., and on their own behalves,

            Plaintiffs,

v.

TROOPER JASON FITZPATRICK,

            Defendant.
--------------------------------------------------------------x

**OPINION AND ORDER**

15 CV 3732 (VB)

Briccetti, J.:

Plaintiffs John and Beverly Terzani bring this Section 1983 action on behalf of their deceased son, John T. Terzani ("Terzani"), and on their own behalves, against defendant Trooper Jason Fitzpatrick, alleging Fitzpatrick used excessive force against Terzani, and caused Terzani's wrongful death, when Fitzpatrick shot and killed Terzani after a seven-hour standoff on August 19-20, 2013.[1]

Before the Court is defendant's motion for summary judgment. (Doc. #43).

For the reasons set forth below, the motion is GRANTED.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted briefs, statements of fact ("SOF"), and affirmations ("Aff.") or declarations ("Decl.") with supporting exhibits, which reflect the following factual background.

---

[1] By Memorandum Decision dated November 3, 2015, the Court dismissed all other claims asserted in the complaint and it dismissed the State of New York, Division of Police as a defendant. (Doc. #21).

1

Beginning at least in November 2012 and through at least June 2013, Terzani suffered from depression, emotional dysregulation, and poor impulse control. He sought medical treatment and took medication to address these mental health issues. However, in June 2013, he stopped seeing his psychiatrist, and suggested he intended to discontinue his medications, against medical advice. On June 30, 2013, Terzani's wife moved out of their home, located at 120 Carpenter Road in East Fishkill, New York, during what the parties agree was a "highly acrimonious" dissolution of their marriage. (Def.'s SOF ¶ 14). Terzani apparently believed his wife was having an affair with another man, and he had concerns about how the separation would affect his finances, including whether he would be able to afford the mortgage on the home.

On August 19, 2013, Terzani and his wife made arrangements for his wife to come to the home "to pick up mail and discuss the cable bill." (Def.'s SOF ¶ 28). His wife arrived at 6:15 p.m. Shortly thereafter, Terzani "pulled out a pistol, put it to his head, and threatened to shoot himself." (Id. ¶ 31). His wife called 9-1-1.

Sometime between 6:18 p.m. and 6:45 p.m., members of the New York State Police, East Fishkill Police Department, and the Dutchess County Sheriff's Office began to arrive at 120 Carpenter Road. Defendant Fitzpatrick, a member of the New York State Police's Special Operations Response Team ("SORT"), arrived at the scene at approximately 9:30 p.m.

During the seven-hour standoff that ensued, Terzani, carrying his handgun, moved between his house and the garage—a distance of approximately eight to fifteen feet—and through the woods behind his house. He called friends on the phone to "say goodbye," and texted his mother asking for forgiveness, which she understood to mean he was going to kill himself. (Pl.'s Resp. to Def.'s SOF ¶¶ 38-41). Terzani repeatedly stated that he wanted law

enforcement officers to shoot him. Law enforcement officials repeatedly instructed Terzani to put his gun down but he did not comply. At various points, Terzani put his gun to his head or inside his mouth.

In the early morning hours of August 20, 2013, for some "long period of time," Terzani walked back and forth between the house and the garage. (Pl.'s Resp.Def.'s SOF ¶ 75). The decision was made that three of the SORT officers would create a "taser team"—consisting of Troopers Kakis, Levin, and Casey— while four SORT officers—Fitzpatrick, Sergeant Pastino, Sergeant Kyle, and Trooper Leeder—created a "cover team" to provide lethal coverage to the taser team, who had to be close enough to Terzani to make contact with the taser.

The plan was for the taser team to wait at the rear of the garage until Terzani walked around the corner of the garage, at which point the taser team would attempt to taser him from behind to subdue him. The cover team positioned itself at the wood line of the property, facing the garage.

At approximately 2:30 a.m., Trooper Kakis attempted to deploy a taser on Terzani but the taser did not make contact with him. The cover team then moved forward toward Terzani. Trooper Kakis again deployed a taser and this time the taser probe struck Terzani in the arm. However, Terzani removed the probe. Each of the members of the cover team, Fitzpatrick, Pastino, Leeder, and Kyle, testified that shortly after this, Terzani pointed his gun toward a member or members of the cover team. Fitzpatrick then fired his rifle three times at Terzani. None of the other officers fired his weapon.

Terzani was shot twice in the torso. Trooper Kakis and a tactical medic administered medical aid on the scene. Terzani was taken by ambulance to St. Francis Hospital in Poughkeepsie, where he was pronounced dead upon arrival.

3

In the ensuing months, the New York State Police's Internal Affairs Bureau conducted an investigation and, on September 18, 2014, issued a letter to Fitzpatrick indicating it had found "no evidence . . . to substantiate any violation of Division Rules, Regulations or Instructions." (Lally Decl. Ex. 49). In addition, on March 12, 2014, a Dutchess County grand jury found "insufficient legal evidence to warrant an Indictment against any person for any crime arising" from the incident. (Id. Ex. 50).

## DISCUSSION

I. Summary Judgment Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See id. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence,

summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II. Defendant's Motion

Defendant argues he is entitled to qualified immunity because he was justified in using deadly force against Terzani under the circumstances.

The Court agrees.

A. Qualified Immunity

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

5

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996) (citations omitted). "In a case involving the use of deadly force, only the objective reasonableness branch of this test presents any possibility for a qualified immunity defense." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 36 (2d Cir. 2003) (citing Salim v. Proulx, 93 F.3d at 91).

"The objective reasonableness test will not be met 'if, on an objective basis, it is obvious that no reasonably competent officer would have concluded,' in that moment that his use of deadly force was necessary." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d at 37 (quoting Malley v. Briggs, 475 U.S. at 341). "It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Id. (citations omitted).

"In cases in which officers have used deadly force, leaving 'the witness most likely to contradict' the officers' version of the events 'unable to testify[,] . . . the court may not simply accept what may be a self-serving account by the police officer' but must instead 'consider circumstantial evidence that, if believed, would tend to discredit the police officer's' version and must 'undertake a fairly critical assessment of, inter alia, the officer's original reports or statements . . . to decide whether the officer's testimony could reasonably be rejected at a trial.'"

Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017) (quoting O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d at 37).

Finally, "[s]ummary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant 'show[s] that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law.'" O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d at 37 (2d Cir. 2003) (quoting Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001)). "[W]here the factual record is not in serious dispute . . . [t]he ultimate legal determination whether, on the facts found, a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide." Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir. 1990).

B. Application

Here, the evidence unquestionably demonstrates Fitzpatrick had probable cause to believe that Terzani posed a significant threat of death or serious harm to the cover team.

First, Trooper Fitzpatrick himself has consistently described Terzani pointing the gun directly at the cover team moments before he fired at Terzani:

- In an interview on April 8, 2014, conducted as part of an investigation into the incident, Fitzpatrick stated, "after [Terzani] pointed the weapon up to . . . Carpenter Road I observed . . . I looked to see where the Taser team was; I followed the cables back as far as I could and I didn't see the Taser team; then when I came back to Mr. Terzani, he was standing in an isosceles firing position with his pistol in both hands pointing in the direction of my team mates that were directly to the right of me." (Sussman Aff. Ex. 15 at 16).

- Fitzpatrick submitted a declaration in which he states he "observed John Terzani square his shoulders, place his legs shoulder width apart, and raise his gun with both hands with his arms extended. Terzani was in an Isosceles shooting stance." (Lally Decl. Ex. 1 at ¶ 72). Fitzpatrick then "observed John Terzani point his gun at SORT Sergeant Pastino and SORT Trooper Kyle, who were directly to my right." (Id. at ¶ 73).

7

- Fitzpatrick testified at his deposition that he observed "Mr. Terzani point[] the weapon up towards Carpenter Road. Then at that time I looked back to . . . make sure that the taser team wasn't moving forward. When I came back to Mr. Terzani, he had [his] weapon[] in [both] hand[s], and he was bringing his weapon up, and he was in an Isosceles shooting stance." (Lally Decl. Ex. 8 at 49).

Second, Sergeant Pastino, Sergeant Kyle, and Trooper Leeder—the three officers who, with Fitzpatrick, made up the cover team—each noted in sworn written statements dated August 20, 2013, the day the standoff ended, that Terzani raised his weapon and pointed it toward a member or members of cover team. Specifically:

- Sergeant Pastino wrote, "[t]he subject . . . raised the pistol to his head, lowered it and pointed in our direction, aiming the pistol straight at us." (Lally Decl. Ex. 39).

- Sergeant Kyle wrote that he "observed the subject raise his weapon and point it at Tpr. Fitzpatrick." (Lally Decl. Ex. 40).

- Trooper Leeder wrote, "the subject pointed the gun he was holding at the direction of all of us." (Lally Decl. Ex. 41).

Moreover, despite plaintiffs' arguments to the contrary, these officers' deposition testimony is consistent on this point:

- Sergeant Pastino testified that "as [Terzani] pulled the Taser probes out, he started to walk again toward the front of the garage there, started to look toward the woodline, and he raised the gun at us." (Lally Decl. Ex. 16 at 46).

- Sergeant Kyle testified that "after getting the taser prong, projectile out of his arm, or ripping the wire, [Terzani] turned and looked in our direction, and raised the gun, and pointed it right in our direction." (Lally Decl. Ex. 13 at 42).

- Trooper Leeder testified that as the cover team members "were moving forward, [Terzani] took the gun out [from under his chin], said something else, and pointed right at police officers – at my team moving towards him." (Lally Decl. Ex. 14 at 62-63).

Finally, at least three other officers involved in the incident corroborate the cover team's testimony:

- Town of Poughkeepsie police officer Christopher Rolison submitted a declaration, in which he states he "saw the suspect raise his arms in front of him in a firing position" just before Rolison heard gun shots. (Lally Decl. Ex. 62 at ¶ 8).

8

- Dutchess County Deputy Sheriff Aaron Chadwell submitted a declaration, in which he states that Terzani "place[d] the muzzle of the pistol in his mouth," then "removed the pistol and pointed it straight out in front of him in a firing stance." (Lally Decl. Ex. 61 at ¶ 31). Chadwell states it "appeared to me that [Terzani] was aiming his gun at someone, but I did not see who." (Id.).

- Trooper Casey, a member of the taser team, gave a sworn statement, in which he states that right after the second taser deployment, Terzani was "highly agitated, and continue[d] covering us with the handgun as well as other members positioned north east of my location." (Lally Decl. Ex. 38).

Plaintiffs attempt to cast doubt on this overwhelming, undisputed evidence by pointing to immaterial inconsistencies in the sworn written statements and testimony of the officers involved in the incident. In particular, plaintiffs make much of the fact that no other officer testified, as Fitzpatrick did, that Terzani stood in a particular shooting position immediately before he was shot. (Opp'n at 6). However, each of the other members of the cover team testified that Terzani raised his weapon and pointed it directly at one or more of the cover team members. That they did not describe Terzani's precise stance when he did so is immaterial. Plaintiffs also argue there are inconsistencies in the testimony regarding toward whom exactly Terzani pointed the weapon, and whether he pointed the gun first at the taser team before pointing it at the cover team, or otherwise waived the gun around before he was shot. (Id. at 12-13). Again, this is immaterial. Regardless of where <u>else</u> Terzani pointed his gun, there is no genuine dispute Terzani ultimately pointed it toward a member or members of the cover team, which prompted Fitzpatrick to fire his weapon.

The Court also rejects plaintiffs' argument that "throughout the standoff, the officers showed restraint precisely because all except Fitzpatrick understood that Terzani did NOT want to fire his weapon, either at himself or at them," and he "explain[ed] that he lacked the courage to kill himself or the desire to harm them." (Opp'n at 14). First, the Court rejects the idea that because Terzani may not have been inclined to shoot an officer earlier in the evening, his raising

9

his gun directly towards officers at the end of the standoff would not reasonably have been understood as a threat to the officers requiring the use of deadly physical force. As the Supreme Court has noted, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396–97 (1989).

The standoff with Terzani was tense, uncertain, and rapidly evolving in the moments leading up to Fitzpatrick's split-second decision to use deadly physical force—in particular, the taser team had just attempted two times to engage Terzani with a taser and the cover team was approaching. Thus, regardless of whether Terzani indicated earlier he did not intend to shoot the police officers—a point that is debatable to begin with, as he was in possession of a loaded handgun the entire time and repeatedly refused to surrender—at the moment Fitzpatrick fired shots, Terzani was pointing his weapon toward the cover team. Any reasonable officer would perceive this as a significant threat of death or serious physical injury to himself and his teammates. See Estate of Devine, 676 F. App'x 61, 63 (2d Cir. 2017) (summary order) ("While the Estate maintains that Devine never intended to harm anyone other than himself, the possession of a firearm is nevertheless a volatile circumstance, made all the more so by Devine's refusal to surrender it and, thus, relevant to whether it was objectively reasonable for Defendants to believe that their actions were lawful.") (citing Zalaski v. City of Hartford, 723 F.3d 382, 389 (2d Cir. 2013)).

Finally, the fact that Fitzpatrick was the only officer who fired his weapon at Terzani does not change the Court's analysis. "The inquiry into a Fourth Amendment excessive use of force claim is not assessed with 20/20 hindsight, but depends only upon the officer's knowledge

10

of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." Estate of Jaquez v. City of New York, 104 F. Supp. 3d 414, 433 (S.D.N.Y. 2015) (internal quotation marks omitted), aff'd sub nom. Estate of Jaquez by Pub. Adm'r of Bronx Cty. v. City of New York, 2017 WL 3951759 (2d Cir. Sept. 8, 2017) (summary order). Here, the bottom line, as defendant correctly asserts, is that "plaintiffs cannot point to a single witness or any physical evidence that would allow a rational juror to conclude that Terzani was not pointing a gun at [the New York State Police] officers when he was shot." (Reply at 1). Under these circumstances, no reasonable jury could conclude—even viewing the evidence in the light most favorable to Terzani—that Fitzpatrick's split-second decision to fire his weapon at Terzani was objectively unreasonable.

The Court has considered plaintiffs' remaining arguments to the contrary and finds them unavailing.

The circumstances of this case are tragic for all concerned—for Mr. Terzani and his family, of course, but also for Trooper Fitzpatrick. Nevertheless, based on the undisputed material facts, the Court is left with the firm conviction that it was objectively reasonable for Fitzpatrick to believe his conduct did not violate clearly established law. He is thus entitled to qualified immunity and, accordingly, summary judgment is warranted as to plaintiffs' Fourth Amendment excessive force claim.

III.     Remaining State Law Claim

To the extent the complaint may be read to include a state law cause of action for wrongful death, and it is not clear that it does, the Court declines to exercise supplemental jurisdiction over that claim. See 28 U.S.C. § 1367(c)(3); Carlsbad Tech., Inc. v. HIF Bio, Inc.,

556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.").

## CONCLUSION

Defendant's motion for summary judgment is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #43) and close this case.

Dated: January 8, 2018
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge